# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| PATRICIA BRADLEY, | : | |
| | : | |
| Plaintiff, | : | Civil No. 15-387 (RBK/KMW) |
| | : | |
| v. | : | **OPINION** |
| | : | |
| LIBERTY LIFE ASSURANCE CO., | : | |
| | : | |
| Defendant. | : | |
| | : | |

**KUGLER**, United States District Judge:

This lawsuit stems from Defendant Liberty Life Assurance Company ("Defendant" or "Liberty") denying Plaintiff Patricia Bradley ("Plaintiff" or "Bradley") long-term disability benefits. Presently before the Court are Plaintiff's Motion for Summary Judgment ("Plaintiff's Motion") [Dkt. No. 13] and Defendant's Motion for Summary Judgment ("Defendant's Motion") [Dkt. No. 14]. For the reasons that follow, Plaintiff's Motion will be **GRANTED-IN-PART**, the matter will be **REMANDED**, and Defendant's Motion will be **DENIED**.

## I.  FACTUAL BACKGROUND AND PROCEDURAL HISTORY[1]

### A.  Plaintiff's Employment

Plaintiff was employed by Western Industries-North beginning in 1990 through March 11, 2013. (PSMF[2] ¶ 2; DRSMF[3] ¶ 2.) At the time she stopped working, Plaintiff was employed

---

[1] The following facts are agreed to by the parties in their statements of material facts unless otherwise indicated. As both parties are cross-moving for summary judgment, neither party benefits from any inferences that may be drawn in their favor

[2] Plaintiff's Statement of Material Facts [Dkt. No. 13-2] submitted with Plaintiff's Motion.

[3] Defendant's Responses to Plaintiff's Statement of Material Facts [Dkt. No. 16-1] submitted with Defendant's Opposition to Plaintiff's Motion.

as a Training & Technical Specialist.  (*Id.*)  Plaintiff's job descriptions lists that she is required to stand frequently while conducting classroom training, sit continuously up to 85% of the time, frequently drive to branches within a four-hour driving distance, walk and climb occasionally, and also bend up to 33% of the time.  (Administrative Record ("R.") [Dkt. Nos. 13-5 to -7] at 168.)  The job description also states that the employee will be "continuously in a seated position while performing the essential function of this occupation" and suggests accommodations like a standing workstation for an employee who cannot sustain a seated position.  (R. at 170.)

Through her employer, Plaintiff was a participant in a Group Disability Income Policy (the "Plan") administered by Defendant.  (R. at 251–303.)  The Plan is covered by the Employee Retirement Income and Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001, et seq.

### B.    Plaintiff's Medical History

Relevant to Plaintiff's claim for long-term disability ("LTD") benefits is her treatment by three medical professionals:  (1) James Holton, M.D., a general internist and Plaintiff's primary care physician; (2) David H. Kim, M.D., a board certified pain management specialist; and (3) Joseph W. McBride, Jr., D.C., a chiropractor.  (PSMF ¶ 10; DRSMF ¶ 10.)[4]  Plaintiff fell in December of 2006 and was seen by a pain specialist in July of 2007 to address that pain.  (PSMF ¶¶ 13–14; DRSMF ¶¶ 13–14; R. at 150–53.)  Plaintiff was thereafter referred to physical therapy and discharged from physical therapy in October of 2007.  (PSMF ¶ 15; DRSMF ¶ 15; R. at 154–57.)

---

[4] It is important to note that Plaintiff did not initially submit records from Dr. Holton or Dr. McBride in support of her LTD claim initially.  They were only submitted in Plaintiff's appeal of the initial denial of LTD benefits.

In July 2012, Plaintiff began seeing Dr. Kim for pain in her sacrum, low back, both hips, left leg, both feet, neck, and shoulders.  (PSMF ¶ 16; DRSMF ¶ 16; R. at 182.)[5]  Plaintiff then was out of work from July through December 2012 on short term disability.  (PSMF ¶ 17; DRSMF ¶ 17; R. at 145.)  When Plaintiff saw Dr. Kim on January 11, 2013, she reported that she had returned to work in a limited capacity and was modifying her activity to avoid sitting.  (PSMF ¶ 18; DRSMF ¶ 18; R. at 183.)  She indicated that she was pain free at times, and that the worst pain was in her sacrum and hips.  (*Id.*)  Dr. Kim performed trigger point needling, compression massage, and manual therapy and mobilization to attempt to relieve myofascial pain syndrome, radiculopathy, and associated symptoms and syndromes.  (PSMF ¶ 18; DRSMF ¶ 18; R. at 183–84.)  Dr. Kim noted that Plaintiff had no relief as a result, but that multiple twitch responses were obtained in the treated muscles.  (R. at 183–84.)

Plaintiff returned to Dr. Kim on February 8, 2013, reporting that symptoms had returned as she increased her activity.  (PSMF ¶ 19; DRSMF ¶ 19, R. at 185–86.)  Dr. Kim performed the same treatments, but this time there was immediate relief.  (*Id.*)  She returned on February 14, 2013 complaining of constant pain while sleeping, reporting that the last session did not help her, and that sitting was the worst for her pain.  (PSMF ¶ 19; DRSMF ¶ 19; R. at 187–88.)  Dr. Kim again performed the same treatment and noted immediate relief.  (*Id.*)

Plaintiff visited Dr. Kim four times in March 2013.  (PSMF ¶¶ 20, 22; DRSMF ¶¶ 20, 22.)  At each visit, Plaintiff complained of continued pain aggravation due to sitting, with the worst pain consistently being in her sacrum and lower back.  (R. at 189–98.)  At three of the four

---

[5] No medical records appear to have been submitted to Defendant for treatment prior to January 11, 2013.  Additionally, medical records from Dr. Kim for the period of January 11, 2013 through August 14, 2013 were produced twice—once with the initial claim, and once with the appeal.  Where duplicates exist, the Court will refer to the documents submitted with the initial claim.

visits,[6] Dr. Kim noted that there was no relief in Plaintiff's pain.  (*Id.*)  The treatment plan continued to be utilizing the same three in-office treatments and instructing Plaintiff to work on a home exercise program.  (*Id.*)  During this time period, Plaintiff began short term disability.  (R. at 143–44.)

On April 12, 2013, Plaintiff returned to Dr. Kim and noted some improvement.  (PSMF ¶ 23; DRSMF ¶ 23; R. at 199–200.)  Again the same treatments were given with no relief.  (*Id.*)  Plaintiff saw Dr. Kim again on May 14, 2013 after visiting Florida, which had aggravated her pain.  (PSMF ¶ 24; DRSMF ¶ 24; R. at 201–02.)  Sitting and driving still aggravated her pain as well.  (*Id.*)  Dr. Kim performed the same treatments again, and immediate relief was noted.  (*Id.*)  On her next visit on June 12, 2013, Plaintiff reported that certain exercises she was trying for pain relief aggravated her sacrum, so she had modified her exercise program.  (PSMF ¶ 25; DRSMF ¶ 25; R. at 203–04.)  Her sacrum and low back still demonstrated the worst pain.  (*Id.*)  The same treatments were performed, and no relief was noted.  (*Id.*)  Her visit on July 10, 2013 was substantially similar to her June visit, with the same reports of pain, the same treatment, and no relief noted.  (PSMF ¶ 26; DRSMF ¶ 26; R. at 205–06.)

In July 2013, Plaintiff also began seeing Dr. McBride for chiropractic treatment.  She had her initial visit on July 18, 2013 and noted that she was on short term disability at the time.  (PSMF ¶ 27; DSRMF ¶ 27; R. at 143–46.)  Plaintiff reported that the pain was constant, only improved by inactivity, made worse by sitting and lying down, and that her job was mostly sitting.  (*Id.*)  She also said she had moderate stress at the time.  (*Id.*)  Her chief complaint was severe tailbone pain, but she also complained of left knee pain and left shoulder pain.  (*Id.*)  Plaintiff saw Dr. McBride four times in July, rating her pain at a 7 out of 10 for three visits, and

---

[6] For one of the visits, the section headed "Response" contains no notes.  (R. at 195.)

as a 4 out of 10 for one visit.  (PSMF ¶ 27; DRSMF ¶ 27; R. at 137.)  She continued seeing Dr. McBride in August, and saw him on nine different occasions.  (PSMF ¶ 28; DRSMF ¶ 28; R. at 134–36.)  Her complaints to Dr. McBride were mostly consistent with the same complaints made to Dr. Kim, and she mentioned to Dr. McBride that the thirty minute drive to his office had increased her pain on occasion.  (*Id.*)  Plaintiff reported that her pain in August ranged from a 4.5 out of 10 to a 9.5 out of 10.  (*Id.*)

Plaintiff returned to Dr. Kim on August 14, 2013 and reported that her prior session had caused her pain for a number of weeks, but that visits with Dr. McBride helped her.  (PSMF ¶ 29; DRSMF ¶ 29; R. at 207–08.)  Plaintiff reported that she drove pain free to that particular appointment.  (*Id.*)  Dr. Kim performed the same treatments on Plaintiff as in all previous visits, noted no relief, and continued the treatment plan.  (*Id.*)

After this visit with Dr. Kim, Plaintiff then applied for the long term disability ("LTD") benefits at issue in this case.  (DSMF[7] ¶ 11; PRSMF[8] ¶ 11; R. at 1, 7.)  Defendant sent Plaintiff a questionnaire and she returned it filled out with details of her condition.  (DSMF ¶¶ 11–12; PRSMF ¶¶ 11–12; R. at 209–20, 232–46.)

In her submission to Defendant on August 22, 2013, Plaintiff explained that she was able to sit for 20-30 minutes, stand for 60-90 minutes, and walk for 30-60 minutes.  (R. at 209.)  She said that after those time periods, she would experience intense pain.  (R. at 211.)  Plaintiff also claimed that each day she sits for 60-90 minutes, stands for 90-180 minutes, walks around daily after lying down, and is in bed for 10-12 hours a day.  (R. at 209.)  Plaintiff said she could drive

---

[7] Defendant's Statement of Material Facts [Dkt. No. 14-2] submitted with Defendant's Motion.

[8] Plaintiff's Responses to Defendant's Statement of Material Facts [Dkt. No. 17-1] submitted with Plaintiff's Opposition to Defendant's Motion.

or ride in a car for up to 30 minutes, but then pain would set in.  (*Id.*)  She told Defendant she left the house only once or twice a week at most to pick up vegetables and prescriptions, would go outdoors with her dog daily, but was unable to work in her garden or on her house.  (R. at 209–10.)

In addition to the intense pain brought on by physical activity, Plaintiff also claimed constant pain from muscle spasms, shooting pain, and burning pain in her tailbone, gluteus muscles, left knee, back, shoulders, feet, and legs.  (R. at 211.)  She described her daily activities as consisting of 20 minutes of yoga in the morning followed by preparing breakfast, doing household chores, preparing lunch, lying down to rest and applying ice and heat as needed for pain, preparing dinner, and lying down to watch television before going to sleep.  (*Id.*)  Plaintiff told Defendant that she sees her doctor weekly, goes for massage therapy two to three times a month, and attempts to go on vacation to Florida once a year if she is able.  (*Id.*)

Dr. Kim also sent his above medical records to Defendant, and included a cover note. (PSMF ¶ 44; DRSMF ¶ 44; R. at 182.)  In his note, Dr. Kim explained that he determined that trigger point needling was medically necessary for her, and that the treatments had reduced her need for costly pain medication and eliminated her need to see other doctors.  (*Id.*)  Based on his evaluations, he did not believe that Plaintiff could return to work before January 2014.  (*Id.*)

Plaintiff subsequently saw Dr. McBride twice in early September, reporting pain around a 5 out of 10 each time.  (PSMF ¶ 30; DRSMF ¶ 30; R. at 134.)  Also in September, Plaintiff presented to her primary care physician, Dr. Holton, in anticipation of eye surgery.  (PSMF ¶ 31; DRSMF ¶ 31; R. at 116–19.)  Dr. Holton noted that her medication include Fentanyl patches as well as Hydrocodone-acetaminophen.  (*Id.*)  She returned to Dr. Kim on October 9, 2013, where she complained of increased stress and pain due to the aforementioned eye surgery.  (PSMF ¶ 32;

DRSMF ¶ 32; R. at 88–89.)  Dr. Kim performed the same treatments, noted no relief, and continued the treatment plan.  (*Id.*)  Plaintiff saw Dr. Kim again on October 29, 2013, reporting minor improvement in her eye, and Dr. Kim performed the same treatments, but noted immediate relief, and continued the treatment plan as well as prescribing massages.  (PSMF ¶ 34; DRSMF ¶ 34; R. at 90–91.)  Plaintiff saw Dr. McBride two days later, indicating that her pain had increased greatly due to the drive to Dr. McBride's office.  (PSMF ¶ 35; DRSMF ¶ 35; R. at 133.)

On November 11, 2013, Plaintiff saw Dr. Holton and complained that the Fentanyl was making her nauseated, so she was not taking it as prescribed, and was also taking Vicodin twice daily due to pain.  (PSMF ¶ 36; DRSMF ¶ 36; R. at 125–28.)  For her pain, Dr. Holton continued the same medication.  (*Id.*)  When Plaintiff saw Dr. Kim two days later, she also complained of nausea, dizziness, and confusion due to the pain medications, and also reported that the medications were not actually helping her pain.  (PSMF ¶ 37; DRSMF ¶ 37; R. at 99–100.)  Dr. Kim performed the same treatments, noted no response, and continued the treatment plan as well as encouraging stress management to decrease muscle tension.  (*Id.*)  Plaintiff then saw Dr. McBride almost a week later on November 18, 2013, for her final visit with him,[9] complaining of the same general symptoms and noting that the drive had increased her pain.  (PSMF ¶ 38; DRSMF ¶ 38; R. at 133.)

Plaintiff returned to Dr. Kim once a month in December 2013, January 2014, February 2014, and March 2014.  (PRSMF ¶¶ 39–41; DRSMF ¶¶ 39–41; R. at 102–10.)  At each visit, she complained of the same pain, and during the progression of her visits explained that she was

---

[9] This may not have been Plaintiff's final visit with Dr. McBride, but it is the final visit for which medical records have been provided.

managing the pain by lying down and not going out much, and that sitting aggravated her pain

the most.  (*Id.*)  At each visit, Dr. Kim performed the same treatments, noted no relief for each

visit, and continued the same treatment plan.  (*Id.*)  Plaintiff also returned to Dr. Holton on April

3, 2014, complaining of pain and explaining that she could not maintain a position for more than

two hours, could not be in a car for more than about thirty minutes, and required more

medication on days when she engaged in more activity.  (PSMF ¶ 42; DRSMF ¶ 42; R. at 129–

31.)  Dr. Holton had increased her Fentanyl patches to a higher dosage prior to this visit,[10] and

Plaintiff reported that she preferred the higher dose patch.  (*Id.*)

### C.      Plaintiff's Disability Claim Processing

Once Plaintiff had submitted her claim, her records were sent for review to Mark Kaplan,

M.D., a board certified physician in physical medicine and rehabilitation for an independent peer

review.  (DSMF ¶ 14; PRSMF ¶ 14; R. at 172–76.)  Dr. Kaplan reviewed Plaintiff's medical

records from Dr. Kim and attempted to get in touch with Dr. Kim on three different occasions,

but was unsuccessful.  (R. at 172–74.)  He determined that "[t]he only supported diagnosis is

myofascial pain."  (R. at 174.)  Dr. Kaplan also found that "the need for medically necessary

work restrictions or a reduced work schedule is not supported," that "[m]inimal medical

information was provided for this review," and that "[t]he results of prior treatments and testing,

if available, would be needed to properly complete the assessment." (R. at 175.)  He explained

that "based on the information provided, the claimant's assessment is incomplete and there is no

particular diagnosis other than myofascial pain which is supported.  Therefore, the treatment plan

is not considered consistent with the current standard of care."  (*Id.*)

---

[10] No record exists of this visit, but between her previous visit with Dr. Holton and this visit in
April, the dosage of Plaintiff's Fentanyl patches increased from 12 Mcg/hr to 25 Mcg/hr.

On October 7, 2013, Defendant informed Plaintiff by written letter that her claim was

denied.  (DSMF ¶¶ 20–21; PRSMF ¶¶ 20–21; R. at 163–66.)  The basis for the denial was set

forth as follows:

> Based on the available medical records, there is no medical evidence to support a
> physical impairment(s) that would translate into restrictions and limitations;
> therefore, we are unable to establish any restrictions that would preclude you from
> functioning in your occupation.  As indicated by the independent physician, the
> medical records indicate you are capable of exercise and travel and noted that you
> are taking minimal over the counter medications to manage pain on what appears
> to be an as needed basis.  As such, there is no objective clinical evidence to support
> that you require restrictions and limitations that would preclude you from
> performing the material and substantial duties of your own occupation.  Therefore,
> you do not meet the Plan's definition of disability, and we must deny your claim.

(R. at 164–65.)

On April 4, 2014, Plaintiff appealed Defendant's denial, and submitted additional records

from Dr. Kim, records from Dr. Holton, records from Dr. McBride, as well as records from her

initial fall in 2006.  (DSMF ¶¶ 22–24; PRSMF ¶¶ 22–24; R. at 53–56.)  Included in this was a

narrative report from Dr. Kim dated December 11, 2013, that was responsive to the peer

evaluation from Dr. Kaplan.  (*Id.*)

In his response, Dr. Kim explained that he disagreed with Dr. Kaplan's assessment and

that he was never informed that Dr. Kaplan had tried to reach him.  (R. at 58.)  Dr. Kim

explained that not only is he a physician certified in pain management, but a patient himself who

found that trigger point needling eventually led to a full recovery of his own pain problems.  (*Id.*)

Dr. Kim went on to explain that Plaintiff suffered myofascial pain in eleven areas, which also

includes the surrounding nerves, bones, joints, and other tissues, and thus he believes that the

pain would be very debilitating.  (R. at 59.)  Dr. Kim also agreed with Dr. Kaplan that his

treatments were not consistent with the current standard of care, but he said that was because the

current standard of care does not work.  (*Id.*)  He detailed his issues with the current standard of

care, including the fact that "[t]he incidence of death from anti-inflammatories equals the

incidence of death from AIDS" and "[t]he amount of narcotic prescriptions has increased 300%

over the past 10 years, and along with it the incidence of overdose, addiction and death has also

increased." (*Id.*)

   Defendant referred Plaintiff's case to another peer reviewer, Daniel Rosenberg, M.D., a

board certified physician in physical medicine and rehabilitation.  (DSMF ¶ 25; PRSMF ¶ 25; R.

at 32–45.)  Dr. Rosenberg was instructed to answer four specific questions in his review of

Plaintiff's file:

   1. What diagnosis is supported by the medical evidence in the file?

   2. Provide a description of the claimant's impairments, if any, and outline how
      any impairment translates to restriction and limitations as of 3/1//13 through
      9/6/13, and as of 9/7/13 forward.  Please describe any supported restrictions as
      fully as possible, indicating when these restrictions began, include the expected
      duration for any supported restriction, and please address sustained capacity.

   3. Please review and comment on the treatment plan, including treatment
      modalities, frequency of treatment, duration and expected outcome.  Has the
      treatment been consistent with the standard of care expected for the severity of
      diagnosis/level of impairment reported?  Please explain and provide evidence
      based documentation to support your opinion.

   4. Do you agree with the assessment of the claimant's capacity and the restrictions
      as noted by the treating providers?  If not, please explain.

(R. at 42.)  Dr. Rosenberg reviewed the original records in addition to the new records

submitted by Plaintiff in her appeal, as well as Dr. Kaplan's review.  (R. at 24–27.)  Dr.

Rosenberg also spoke with Dr. Kim for approximately eight to ten minutes regarding

Plaintiff's treatment.  (R. at 29–30.)

   In his evaluation, Dr. Rosenberg assessed that Dr. Kim's evaluations were

"vague, non-specific . . . [and] not thorough in [his] opinion."  (R. at 28.)  Turning to the

questions posed to him, Dr. Rosenberg determined that "[t]he only diagnosis supported

by medical evidence in file is myofascial pain and multi-body pain, etiology

unknown. . . . She has no apparent objective evidence or specific subjective symptoms of

cervical or lumbar radiculopathies.  There is no evidence of upper motor neuron

pathology.  There is no specific evidence of facet pathology." (*Id.*)  As a result, he found

"no specific evidence of any specific impairments, restrictions or limitations based on

any information provided for [his] review within a reasonable degree of medical

certainty." (*Id.*)  Dr. Rosenberg explained:

> There is no specific report of exactly what is being treated aside from
> patient's subjective symptoms of multi-body pain syndrome with report
> from Dr. Kim's evaluations of postural abnormalities and trigger points.
> There is no specific report of exactly what is being treated.  Evaluations and
> treatment plan, in my opinion, is vague and nonspecific.  In my opinion, the
> treatment, modalities provided, frequency of treatment, duration and
> expected outcome is not consistent with the standard of care expected for
> the severity of diagnosis or level of impairment reported.  In my opinion,
> the specific diagnosis is vague and at most notes myofascial pain etiology
> unknown.  In my opinion, there is no specific level of impairment with
> information provided for my review, within a reasonable degree of medical
> certainty.

(R. at 29.)  Dr. Rosenberg went on to disagree with the assessment of capacity and restrictions

noted by treating providers, and opined that Plaintiff "should be capable of performing any job

function compatible with this age group." (*Id.*)  He said that his conversation with Dr. Kim did

not change his opinions.  (R. at 29–30.)

Thereafter on May 27, 2014, Defendant informed Plaintiff that they would not

alter their original determination to deny benefits.  (DSMF ¶ 31; PRSMF ¶ 31; R. at 13–

17.)  The rationale for denying her claim at the final denial stage was that, "After a

thorough review of [Plaintiff's] file and the additional information received on appeal, we

conclude that [Plaintiff] did not meet the elimination period, the definition of disability

and the evidence does not support that she has been under appropriate available

11

treatment." (R. at 16.)  This letter informed Plaintiff that she had the right to bring a

claim pursuant to ERISA § 502 if she still disagreed with the determination.  (R. at 16–

17.)

> **D.     Defendant's Plan**

The Plan provides the relevant definitions for various terms relevant to this suit.

The Plan defines "Disability Benefit" as:

> When Liberty receives Proof that a Covered Person is Disabled due to Injury or
> Sickness and requires the Regular Attendance of a Physician, Liberty will pay the
> Covered Person a Monthly Benefit after the end of the Elimination Period, subject
> to any other provisions of this policy.  The benefit will be paid for the period of
> Disability if the Covered Person gives to Liberty Proof of continued:
> 1. Disability;
> 2. Regular Attendance of a Physician; and
> 3. Appropriate Available Treatment.
>
> The Proof must be given upon Liberty's request and at the Covered Person's
> expense.  In determining whether the Covered Person is Disabled, Liberty will not
> consider employment factors including, but not limited to, interpersonal conflict in
> the workplace, recession, job obsolescence, paycuts, job sharing and loss of a
> professional or occupational license or certification.

(R. at 278.)  The "Proof" required by the Plan is defined in the policy:

> "Proof" means the evidence in support of a claim for benefits and includes, but is
> not limited to, the following:
> 1. a claim form completed and signed (or otherwise formally submitted) by
>    the Covered Person claiming benefits;
> 2. an attending Physician's statement completed and signed (or otherwise
>    formally submitted) by the Covered Person's attending Physician; and
> 3. the provision by the attending Physician of standard diagnosis, chart notes,
>    lab findings, test results, x-rays and/or other forms of objective medical
>    evidence in support of a claim for benefits.
>
> Proof must be submitted in a form or format satisfactory to Liberty.

(R. at 265 (emphasis removed).)  The Plan also defines "Disabled":

> "Disability" or "Disabled", with respect to Long Term Disability, means:
> 1. For persons other than pilots, co-pilots, and crewmembers of an aircraft:
>    during the Elimination Period and until the Covered Person reaches the
>    end of the Maximum Benefit Period, as a result of an Injury or

12

> Sickness, he is unable to perform the Material and Substantial Duties
> of his Own Occupation.

(R. at 263 (emphases removed).)  The Plan also defines what is meant by "Appropriate Available Treatment" in determining whether a covered person is entitled to disability benefit:

> "Appropriate Available Treatment" means care or services which are:
> 1. generally acknowledged by Physicians to cure, correct, limit, treat or manage the disabling condition;
> 2. accessible within the Covered Person's geographical region;
> 3. provided by a Physician who is licensed and qualified in a discipline suitable to treat the disabling Injury or Sickness;
> 4. in accordance with generally accepted medical standard of practice.

(R. at 258 (emphasis removed).)  Finally, the Plan describes how the Plan shall be interpreted:

> Liberty shall possess the authority, in its sole discretion, to construe the terms of this policy and to determine benefit eligibility hereunder.  Liberty's decisions regarding the construction of the terms of the policy and benefit eligibility shall be conclusive and binding.  However, these decisions may be modified or reversed by a court or regulatory agency with appropriate jurisdiction.

(R. at 296.)

## II.    JURISDICTION

Plaintiff is seeking review of the decision of a denial of benefits under ERISA § 502(a), 29 U.S.C. § 1132(a).  As such, this Court exercises subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 29 U.S.C. §§ 1132(e)–(f).

## III.    LEGAL STANDARD

### A.    Summary Judgment Standard

Summary judgment is appropriate where the Court is satisfied that "there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 330 (1986).   A genuine dispute of material fact exists only if the evidence is such that a reasonable jury could find for the non-moving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  When the Court

weights the evidence presented by the parties, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255.

The moving party bears the burden of establishing that no genuine issue of material fact remains. *See Celotex*, 477 U.S. at 322–23. A fact is material only if it will affect the outcome of a lawsuit under the applicable law, and a dispute of a material fact is genuine if the evidence is such that a reasonable fact finder could return a verdict for the nonmoving party. *See Anderson*, 477 U.S. at 252. Even if the facts are undisputed, a disagreement over what inferences may be drawn from the facts precludes a grant of summary judgment. *Ideal Dairy Farms, Inc. v. John Labatt, Ltd.*, 90 F.3d 737, 744 (3d Cir. 1996). Further, "any unexplained gaps in materials submitted by the moving party, if pertinent to material issues of fact, justify denial of a motion for summary judgment." *Id.* (quoting *Ingersoll-Rand Fin. Corp. v. Anderson*, 921 F.2d 497, 502 (3d Cir. 1990)) (internal quotations and alterations omitted).

The nonmoving party must present "more than a scintilla of evidence showing that there is a genuine issue for trial." *Woloszyn v. Cty. of Lawrence*, 396 F.3d 314, 319 (3d Cir. 2005). The court's role in deciding the merits of a summary judgment motion is to determine whether there is a genuine issue for trial, not to determine the credibility of the evidence or the truth of the matter. *Anderson*, 477 U.S. at 249.

### B.    ERISA Standard of Review

Under ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B), a participant in an ERISA plan may sue "to recover benefits due to him under the terms of his plan." "[C]ourts reviewing the decisions of ERISA plan administrators or fiduciaries in civil enforcement actions brought pursuant to 29 U.S.C. § 1132(a)(1)(B) should apply a deferential abuse of discretion standard of review across the board and consider any conflict of interest as one of several factors in

considering whether the administrator or the fiduciary abused its discretion." *Estate of Schwing v. The Lilly Health Plan*, 562 F.3d 522, 525 (3d Cir. 2009) (citing *Met. Life Ins. Co. v. Glenn*, 554 U.S. 105, 115–16 (2008)).[11]   In the ERISA context, "abuse of discretion" and "arbitrary and capricious" standards of review are "practically identical." *Id.* at 526 n.2.  The standard has been explained as being "without reason, unsupported by substantial evidence or erroneous as a matter of law." *Fleisher v. Standard Ins. Co.*, 679 F.3d 116, 121 (3d Cir. 2012) (quoting *Miller v. Am. Airlines, Inc.*, 632 F.3d 837, 845 (3d Cir. 2011)).

"A plan administrator's final post-appeal decision should be the focus of review." *Funk v. CIGNA Grp. Ins.*, 648 F.3d 182, 191 n.11 (3d Cir. 2011), *abrogated on other grounds by Montanile v. Bd. of Trs. of Nat'l Elevator Indus. Health Benefit Plan*, 136 S. Ct. 651 (2016). However, "[a] court may of course consider a plan administrator's pre-final decisions as evidence of the decision-making process that yielded the final decision, and it may be that questionable aspects of or inconsistencies among those pre-final decisions will prove significant in determining whether a plan administrator abused its discretion." *Id.* (citing *Miller*, 632 F.3d at 855–56).

Additional factors for a reviewing court to consider may also include "procedural concerns about the administrator's decision making process." *Estate of Scwhing*, 562 F.3d at 526; *see also Miller*, 632 F.3d at 845.  However, "[t]he presence of procedural irregularities do

---

[11] The Court expresses some concern with the fact that Defendant in its opening brief cited to and relied on the sliding scale standard of *Pinto v. Reliance Standard Life Insurance Co.*, 214 F.3d 377, 392 (3d Cir. 2000).  (Def.'s Mot. Br. at 7–8.)  The sliding scale standard was overruled by *Estate of Schwing*, and replaced by the standard announced in *Estate of Schwing* as recognized by the Third Circuit in *Howley v. Mellon Financial Corp.*, 625 F.3d 788, 792–93 & n.5 (3d Cir. 2010).  Although Defendant walked back from this position in its Reply, (*see* Def.'s Reply at 2 n.1), there is still no acknowledgement that Defendant made an error in law by explicitly relying on the overruled sliding scale in its opening brief.

not change 'the standard of review, say, from deferential to *de novo* review,' but rather are

weighed as factors to consider such [that] any particular one 'will act as a tiebreaker when the

other factors are closely balanced.'"  *Morrison v. PNC Fin. Servs. Grp., Inc.*, Civ. No. 13-804

(JEI/JS), 2015 WL 1471865, at *5 (D.N.J. Mar. 31, 2015) (quoting *Glenn*, 554 U.S. at 115, 117),

*appeal docketed sub nom. Morrison v. Liberty Life Assurance Co. of Boston*, No. 15-2095 (3d

Cir. May 5, 2015).

## IV.    DISCUSSION

Plaintiff raises a number of challenges to Defendant's determination that she is not

entitled to disability benefits.  Primarily, Plaintiff challenges the evaluation and consideration of

the clinical evidence, including the opinions of her treating physicians, in determining that she is

not disabled, as well as challenging the apparent requirement of Defendant that Plaintiff provide

objective medical evidence of her pain.  (*See generally* Pl.'s Mot. Br.)  For the reasons that

follow, the Court agrees with Plaintiff that the determinations made by Defendant were arbitrary

and capricious, and so will remand this matter to Defendant, and deny Defendant's Motion.

### A.    Evaluation and Consideration of Clinical Evidence

As defined by the Plan, and as explained above, in order to be entitled to a disability

benefit under the Plan, the covered person must be disabled and also provide proof of appropriate

available treatment.  (*See* R. at 13–14, 257–66, 278.)  The appropriate available treatment must

then be "in accordance with generally accepted medical standards of practice."  (*Id.*)  Defendant

referred to this as a basis for its denial in its letter denying Plaintiff's appeal, informing her that

"the evidence does not support that she has been under appropriate available treatment."  (R. at

16.)  However, Defendant only raised this for the first time at the appeals stage.  In its initial

denial, Defendant based the denial on a lack of "medical evidence to support a physical

16

impairment(s) that would translate into restrictions and limitations" and an inability to "establish any restrictions that would preclude [Plaintiff] from functioning in your occupation."  (R. at 164.)  Further, at the initial denial stage, Defendant noted "there is no objective clinical evidence to support" a finding of restrictions in finding Plaintiff not disabled.  (R. at 164–65.)  No mention was made of the appropriate available treatment.

Essentially, at the initial denial stage, Defendant told Plaintiff that she was not disabled under the definition of "disabled" under the Plan, and subsequently at the appeals stage told Plaintiff that she was not disabled under the terms of the Plan and *additionally* was not undertaking appropriate available treatment to obtain disability benefit under the Plan.  The Court will address these two bases of denial, beginning with the appropriate available treatment.

### 1.    Appropriate Available Treatment

Adding a reason for denying benefits at the appeals stage is inappropriate, as other courts have determined.  *See Gabriel v. Alaska Elec. Pension Fund*, 773 F.3d 945, 963 (9th Cir. 2014) ("[W]e have held that an administrator may not raise a new reason for denying benefits in its final decision, because that would effectively preclude the participant 'from responding to that rationale for denial at the administrative level,' and insulate the rationale from administrative review.") (quoting *Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 974 (9th Cir. 2006) (en banc)); *Mullica v. Minn. Life Ins. Co.*, No. 11-4034, 2013 WL 5429295, at *6 (E.D. Pa. Sept. 27, 2013) ("Thus, 'tacking on' an additional basis of denial constitutes a 'procedural irregularity' that violates ERISA.") (quoting *Abatie*, 458 F.3d at 974).[12]  This "tacking on" of another reason

---

[12] The Court expresses no opinion on whether this creates a problem under ERISA § 503, 29 U.S.C. § 1133 as these cases have discussed, because the parties have not raised this issue.

to deny Plaintiff is both improper and, more importantly, an inaccurate reason that goes against the weight of the medical evidence.

Defendant in arguing that Plaintiff's treatment is not appropriate relies heavily on a written response by Dr. Kim to Defendant's first peer review by Dr. Kaplan. (*See, e.g.*, Def.'s Mot. Br. at 13–14; Def.'s Opp. at 11–12.) In the first peer review of Plaintiff's claim, Dr. Kaplan stated that Plaintiff's treatment was not within the currently accepted standard of care. (R. at 175.) In responding to the peer reviewer, Dr. Kim agreed with and acknowledged that fact, expressly stating, "[The reviewer] states that the current treatment plan is not considered consistent with the current standard of care. *I would agree with this*, because the standard of care does not work." (R. at 59 (emphasis added).) Dr. Kim then went on to explain that he does not believe in using muscle relaxants or anti-inflammatories because they do not specifically relax the muscle spasms. (*Id.*) Dr. Kim also expressed grave concerns about the potential for addiction and death from narcotics, analogizing the risk of using such medications to the risk of dying from AIDS. (*Id.*)

Plaintiff counters that it is improper to rely on this statement from Dr. Kim, because Dr. Kim has also explained why he believes trigger point needling is appropriate. (*See, e.g.*, Pl.'s Reply at 6–7; Pl.'s Opp. at 9–14.)[13] Additionally, as evidence that her treatment was indeed within the accepted medical standards of practice, Plaintiff points to the statement of Defendant's second peer reviewer, Dr. Rosenberg, that "[t]reatment plan noted above appears to be

---

[13] Plaintiff in her briefs also provides medical literature cites regarding the effectiveness of trigger point needling. (*See* Pl.'s Mot. Br. at 8, 11; Pl.'s Reply at 6–7; Pl.'s Opp. at 10–11.) However, these medical literature cites were never provided to Defendant during the review of Plaintiff's claims, and the Court is not in a position to evaluate their impact on Plaintiff's claims now.

stereotypical noting Duragesic patch [a/k/a Fentanyl], Vicodin, trigger point dry needling, compression massage."  (Pl.'s Opp. at 11 (citing R. at 29).)

The Court must agree with Plaintiff.  Defendant has not elucidated in any rejection of Plaintiff's claim what the appropriate standard of care is or why Plaintiff's treatment is inappropriate.  It appears that the first time Defendant attempted to articulate the appropriate standard of care was in its opening brief, and it seems that Defendant believes the standard of care requires medication and testing.  (*See* Def.'s Mot. Br. at 14.)  Defendant explains that "Dr. Kim's trigger point injections, massages, over the counter medications, and homeopathic remedies simply fail to meet the appropriate available treatment standard required by the Plan." (*Id.*)  Despite the fact that Dr. Kim stated that his treatment alone was not squarely within the standard of care and takes what may be an idiosyncratic view in his aversion to pain medication, his opinions regarding the efficacy of trigger point needling are not rendered invalid.[14]  Further, Plaintiff's other treating physician, Dr. Holton, provided her with the pain medication that was noted by Dr. Rosenberg to be part of a "stereotypical" treatment plan along with Dr. Kim's treatment.

Even assuming that the correct standard of care includes medication, there was no fault in Dr. Kaplan's initial opinion that Plaintiff's treatment was outside the standard of care, because the record available to him at the time only contained the treatment records of Dr. Kim.  As such, Dr. Kaplan could not be aware that Plaintiff was using Fentanyl patches or taking Vicodin for her pain issues.  However, once Dr. Rosenberg was made aware of the medication, he

---

[14] The Court does express some concern about whether the trigger point needling is actually effective for Plaintiff, as the vast majority of her treatments with Dr. Kim reflect that there actually was no relief from the pain as a result of the treatment provided, although twitch responses were obtained with each treatment.

acknowledged that Plaintiff was taking pain medication and stated that her treatment plan was "stereotypical."

It is contradictory for Defendant to argue that Plaintiff has conceded that her treatment is outside the standard of care when not taking into consideration the treatment Plaintiff has received from every physician, which compels the conclusion from Defendant's own reviewer that the treatment is "stereotypical."

The record does not support Defendant's finding that Plaintiff was not undertaking appropriate available treatment. Rather, Defendant reached that conclusion by selectively focusing its attention on the treatment of Dr. Kim to the exclusion of medication from Dr. Holton and additional chiropractic care from Dr. McBride. Further, "tacking on" this rationale was inappropriate. The determination finds no basis in the evidence, is unreasonable, and the acting of "tacking on" was erroneous as a matter of law. Thus, the Court concludes that this determination was arbitrary and capricious.

### 2.   Disabled Under the Plan Definition

Even with the Court finding that adding an additional at the administrative appeal stage was inappropriate, this still leaves the determination that Plaintiff does not qualify as disabled under the definition in the Plan.

It is clear from the initial letter denying LTD benefits and the letter denying Plaintiff's appeal that Defendant relied heavily on the opinions of its non-examining peer reviewers. (*See* R. at 13–17, 163–66.) It is true that ERISA plan administrators need not give special deference to treating physician opinions, but neither are they free to "arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of treating physicians." *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003). Further, an insurer "is not entitled to cherry-pick among

medical reports, including among its own consulting physicians, "disfavor[ing] the claimant at each crossroads.'" *Morrison*, 2015 WL 1471865, at *10 (quoting *Culley v. Liberty Life Assurance Co. of Bos.*, 339 F. App'x 240, 244–45 (3d Cir. 2009)).

Throughout this circuit, and indeed nationwide, the weight of authority is that "courts are troubled where a plan administrator denies a claim by relying on the paper-review reports of consultants that oppose the conclusions of treating physicians." *Kelly v. Reliance Standard Life Ins. Co.*, Civ. No. 09-2478 (KSH), 2011 WL 6759632, at *6 (D.N.J. Dec. 22, 2011) (collecting cases). As the court in *Kelly* further remarked, "[a] strong emphasis on paper review reports is of even greater concern where, as in this case, the plan administrator had the discretion to supplement the record by requiring an independent medical evaluation ("IME") but chose not to." *Id.* (citing *Schwarzwaelder v. Merrill Lynch & Co., Inc.*, 606 F. Supp. 2d 546, 559 (W.D. Pa. 2009)). "Courts have noted the particular appropriateness and helpfulness of an IME where the disability claim encompasses significant inherently subjective complaints." *Schwarzwaelder*, 606 F. Supp. 2d at 560 (collecting cases).

Dr. Kim repeatedly and emphatically expressed his concern that Plaintiff suffered limitations as a result of her pain. He explained in his supplemental submissions that Plaintiff's "chronic low back/SI/sacral pain remained the worst which prevented her from sitting for any extended period of time. This would severely limit working on a computer and driving, both of which are requirements for her job." (R. at 58.) He further explained that "severe low back in only one area is enough to warrant work restrictions," after discussing how Plaintiff suffers pain in eleven different areas. (R. at 59 (emphasis removed).) Dr. Holton expresses no opinion on Plaintiff's limitations, but as explained in this Court's review of the medical record, Dr. Holton consistently notes that Plaintiff is in pain and went so far as to prescribe transdermic Fentanyl

patches in an attempt to provide constant pain relief.  Similarly, Dr. McBride provided treatment up to nine times in one month to address Plaintiff's pain.

The second peer reviewer, Dr. Rosenberg, also noted that "Dr. Kim reiterated a few times concerning the sacroiliac joint lock up and sacroiliac joint pain and how it affects her inability to sit or function."  (R. at 30.)  However, based in part on the "non-specific and vague" evaluations, Dr. Rosenberg determined that there was "no specific evidence of any specific impairments, restrictions or limitations."  (R. at 28.)  Defendant then credited this finding in denying Plaintiff's appeal and finding that she had no limitations that would constitute being disabled under the terms of the Plan.  (*See* R. at 16.)

Dr. Rosenberg, in rejecting Dr. Kim's conclusions, provided no medical basis for his rejection.  Rather, he dismissed the opinion out of hand, and determined that Plaintiff "*may have* sustained a lumbosacral sprain and strain type injury or *possibly* coccydynia . . . [which] *may* have been amendable to physical therapy up to eight sessions over eight weeks."  (R. at 29 (emphases added).)  This speculation about what a claimant's injury was, without actually examining the claimant, is exactly the type of peer review findings rejected by the court in *Kelly*. *See Kelly*, 2011 WL 6756932, at *6–7.  The court in *Kelly* also explained that, "while it is acceptable for the administrator to credit the contrary evidence of a non-treating physician, where a non-treating physician's opinion simply cites to an absence of information it does not serve to refute the treating physician's conclusions, and in and of itself is not a reasonable explanation for denying benefits."  *Id.* at *8 (citation omitted).  Yet, that is precisely what Defendant here did.

Additionally, it appears from the record that Defendant in crediting its non-examining peer reviewers failed to consider treatment from all of Plaintiff's treating physicians, and chose

to focus solely on treatment received from Dr. Kim.  In Defendant's letter informing Plaintiff

that her appeal was denied, Defendant only relied on medical records from Dr. Kim, and only

mentioned records from other physicians in passing.  (*See* R. at 13–17.)  In fact, the only

discussion of Dr. Holton's records at all was to clarify that Defendant was not considering

Plaintiff's eye condition in its disability determination.  (R. at 16.)

In sum, Defendant relied entirely on their non-examining peer reviewer who selectively

rejected evidence of Plaintiff's pain symptoms, failed to request an IME, and gave no

independent weight to the opinion of any of Plaintiff's treating physicians.  The Court concludes

that the finding of no functional limitations was contrary to the medical record and finds no basis

in the evidence, and thus constitutes an arbitrary and capricious finding.

### B.        Subjective Complaints of Pain

Plaintiff further challenges Defendant's apparent requirement that Plaintiff submit

objective evidence of her pain symptoms.  (*See* Pl.'s Mot. Br. at 14–19.)  Although this issue has

been mostly addressed by the Court in finding Defendant's rejection of Plaintiff's treating

physicians arbitrary and capricious, it warrants some additional discussion.  Plaintiff argues that

Defendant failed to appropriately credit her subjective complaints, resting its rejection of her

claim on a lack of objective evidence of functional limitations.  (*Id.*)  Defendant responds that the

peer reviewers did consider her complaints of pain, but balanced those complaints against reports

that Plaintiff was able to travel, exercise, drive, and practice yoga.  (Def.'s Opp. at 12–14.)

"A claimant's subjective accounts cannot be wholly dismissed, particularly where . . .

'the plan itself does not restrict the type of evidence that may be used to demonstrate total

disability.'"  *Kelly*, 2011 WL 6756932, at *9 (quoting *Glenn v. MetLife*, 461 F.3d 660, 672 (6th

Cir. 2006), *aff'd* 554 U.S. 105 (2008)).  However, Defendant here has done just that—wholly dismissed Plaintiff's claims of pain.

In its initial denial, Defendant informed Plaintiff that "there is no objective clinical evidence to support that you require restrictions and limitations that would preclude you from performing the material and substantial duties of your own occupation."  (R. at 165.) Additionally, Dr. Rosenberg concluded in his peer review, which was adopted by Defendant in its appeal letter, that "there is no specific evidence of any specific impairments, restrictions or limitations."  (R. at 16; *see also* R. at 28.)  For Defendant to now claim that this was not a requirement of objective evidence is contradictory.

As noted by Plaintiff, numerous courts within and without this circuit have come to the conclusion that it is improper to require objective medical evidence for claims such as chronic fatigue syndrome, fibromyalgia, and other conditions for which objective evidence is hard to procure.  (*See* Pl.'s Mot. Br. at 14–19); *see, e.g.*, *Lamanna v. Special Agents Mut. Benefits Ass'n*, 546 F. Supp. 2d 261, 299–300 (W.D. Pa. 2008) (collecting cases); *see also Gilmore v. Liberty Life Assurance Co. of Bos.*, No. 13-178 PJH, 2014 WL 1652048, at *5–6 (N.D. Cal. Apr. 24, 2014).  Defendant neither responds to nor attempts to distinguish any of these cases, simply responding that Plaintiff has mischaracterized the peer reviews and that Plaintiff's ability to sit, travel, practice yoga, and exercise should dictate the outcome here.  (*See* Def.'s Opp. at 12–14.)[15]

But as noted by Plaintiff in her opening and reply brief, this is a further example of Defendant cherry-picking and taking out of context evidence from the medical record in order to

---

[15] Defendant also repeatedly implies that the alleged sedentary nature of Plaintiff's job should be outcome determinative.  (*See* Defs.' Mot. Br. at 12–14.)  As noted below, in Section IV.C., *infra*, the determination of whether Plaintiff's job is sedentary is not properly before this Court as it never formed the basis of a denial.

support its conclusion.  When the medical record is reviewed as a whole, it is clear that

Plaintiff's yoga and exercise were attempts to mitigate her pain and incorporate home exercise

into her treatment.  Further, Plaintiff does not dispute that she can sit; she disputes her ability to

sit for prolonged periods of time.  Finally, with respect to Plaintiff's ability to travel, the Third

Circuit has made clear, albeit in the Social Security context, that "[d]isability does not mean that

a claimant must vegetate in a dark room excluded from all forms of human and social activity."

*Smith v. Califano*, 637 F.2d 968, 971 (3d Cir. 1981).  The fact that Plaintiff reported she was able

to travel once does not render all of her other complaints of pain invalid.

In Dr. Rosenberg's review of the medical record, he indicates that the medical notes from

September 27, 2013 reveal Plaintiff's ability "to exercise and travel and do not support the

presence of any functional deficits."  (R. at 26.)  This is the only instance in which

Dr. Rosenberg indicates that there is some evidence that Plaintiff has capabilities that belie her

claimed functional limitations.  However, this is actually not one of Plaintiff's medical records—

this is the first peer review from Dr. Kaplan.  (*See* R. at 26 "09/27/13 MLS Peer Review

Services.  Dr. Kaplan.")  This is despite the clear statement from Defendant to this Court that

"Dr. Rosenberg was not provided with a copy of Dr. Kaplan's peer review when he reviewed

Plaintiff's records."  (Def.'s Opp. at 8–9.)  Plaintiff argues that this makes it "obvious that [Dr.

Kaplan's report] was not only provided, but it was reviewed extensively by Dr. Rosenberg."

(Pl.'s Reply at 8.)  The Court must agree with Plaintiff, and is also disappointed that Defendants

have so clearly misrepresented the record in this manner, as this casts severe doubt on the

conclusions Dr. Rosenberg made.

In light of the fact that Dr. Rosenberg had Dr. Kaplan's peer review as part of his review,

and the fact that Defendant repeatedly contradicts itself in its arguments before this Court when

25

compared to the administrative record, the Court finds that Defendant improperly required that Plaintiff provide objective proof of pain to support her claim of disability.  This, too, renders the determination arbitrary and capricious.

### C.    Nature of Job

The parties have also briefed and disputed whether Plaintiff's job was sedentary.  (*See* Def.'s Mot. Br. at 10; Def.'s Opp. at 12–14; Pl.'s Opp. at 4–5; Def.'s Reply at 6; Pl.'s Reply at 2–3.)  At this stage, this issue is not properly before the Court.  Defendant's determination did not turn on the nature of Plaintiff's job.  Rather, Defendant determined that Plaintiff had no functional limitations, and thus never evaluated whether that would affect her job performance. (*See* R. at 13–17, 163–66.)  The Court does express frustration that Defendant repeatedly and emphatically mentions that Plaintiff's job is sedentary in conjunction with its arguments that its decision should be upheld, when Defendant never once reached the issue of applying functional limitations to Plaintiff's job descriptions and job requirements.  As that analysis never occurred, the Court will not express an opinion regarding the nature of Plaintiff's job.

### D.    Defendant's Contentions

In its motion for summary judgment, Defendant argues (1) Plaintiff failed to carry her burden of proving disability; (2) Plaintiff's records demonstrate functional capabilities at odds with her claimed restrictions and limitations; and (3) Plaintiff was not seeking appropriate available treatment for her condition.  (*See generally* Def.'s Mot. Br.)  In addressing all of the points raised by Plaintiff in her motion, the Court has generally dealt with and rejected all of the bases for affirmance of Defendant's decision as put forth by Defendant in its motion. Accordingly, Defendant's Motion will be denied.

26

### E.    Remedy

Having determined that Defendant's denial of benefits to Plaintiff was arbitrary and capricious, the Court now turns to the appropriate remedy.  Plaintiff requests that the Court reverse the denial of benefits and direct payment to her of accrued benefits and reinstatement of her benefits.  (*See* Pl.'s Mot. Br. at 29.)  However, as the Third Circuit has held, "[i]n a situation where benefits are improperly denied at the outset, it is appropriate to remand to the administrator for full consideration of whether the claimant is disabled."  *Miller*, 632 F.3d at 856.

Accordingly, the appropriate remedy here is a remand to the plan administrator to reevaluate whether Plaintiff is entitled to LTD benefits under the Plan, with reasonable discretion not inconsistent with this Opinion.

### V.    CONCLUSION

For the foregoing reasons, Plaintiff's Motion will be GRANTED in part and REMANDED in part to Defendant for reevaluation with reasonable discretion not inconsistent with this opinion, and Defendant's Motion will be DENIED.  An appropriate order accompanies this opinion.

Date:  June  21st , 2016

 s/ Robert B. Kugler
ROBERT B. KUGLER, U.S.D.J.

27